UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIE HARPER,

        *Plaintiff*,

v.

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.
_____/

CIVIL ACTION NO. 2:16-cv-11428
DISTRICT JUDGE SEAN F. COX
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 24, 25)

**I.    RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Harper is not disabled. Accordingly, **IT IS RECOMMENDED** that Harper's Motion for Summary Judgment, (Doc. 24), be **DENIED**, the Commissioner's Motion, (Doc. 25), be **GRANTED**, and this case be **AFFIRMED**.

**II.    REPORT**

    **A.    Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Willie Harper's ("Harper") claim for a period of disability and Supplemental Security Income Benefits ("SSI") under Title XVI, 42 U.S.C. § 1381 *et*

1

*seq.* (Doc. 3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 24, 25).

On November 21, 2012, Harper filed an application for SSI, alleging a disability onset date of November 1, 2012. (Tr. 124-29). The Commissioner denied his claim. (Tr. 59-74). Harper then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on July 21, 2014 before ALJ John A. Ransom. (Tr. 28-58). The ALJ's written decision, issued November 7, 2014, found Harper not disabled. (Tr. 8-27). On February 19, 2016, the Appeals Council denied review, (Tr. 1-4), and Harper filed for judicial review of that final decision on October 3, 2016. (Doc. 1).

### B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court

will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

    **C.**    **Framework for Disability Determinations**

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the

3

> regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two. 20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or

4

result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Harper not disabled under the Act. (Tr. 8-27). At Step One, the ALJ found that Harper had not engaged in substantial gainful activity since November 21, 2012. (Tr. 13). At Step Two, the ALJ concluded that the following impairments qualified as severe: degenerative disc disease, depression, and a history of substance abuse. (Tr. 13-18). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 18-20). Thereafter, the ALJ found that Harper had the residual functional capacity ("RFC") to perform light work, except:

> for the need of a sit/stand option, at will; no bending, twisting or turning; no repetitive pushing or pulling, and no repetitive griping [sic] or grasping; no use of air or vibrating tools; limited contact with the public; and the work should be simple, repetitive with simple verbal instructions; [t]he work should not require constant, close attention to detail and only require occasional supervision

(Tr. 20). At Step Four, the ALJ found Harper incapable of performing his past relevant work as a production welder, parts painter, machine operator/helper, or chemical mixer. (Tr. 22). Proceeding to Step Five, however, the ALJ found that jobs exist in significant numbers in the national economy that he could perform. (Tr. 23).

### E. Administrative Record

#### 1. Medical Evidence

5

The Court has reviewed Harper's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 2. Application Reports and Administrative Hearing

#### i. Function Report

On January 21, 2013, Harper filled out a Function Report with the help of Iileen Donnell. Describing his conditions, he noted how "[c]hronic back pain prevents me from lifting, prolonged walking, sitting or standing. I suffer depression which causes my mood to change throughout the day from feeling hopeless, sadness and angry and makes me feel sleepy and tired throughout the day. I have frequent bathroom use due to prostate problems. I suffer from chronic neck pain that causes me to suffer from headaches and discomfort." (Tr. 169). In a typical day, "I usually wake up about 4 a.m. because I cannot sleep. I take my medication and may have breakfast. Then spend the rest of the day changing positions from standing, sitting, and laying down. I take my medications in the evening [and] may have dinner then try to go to bed about 9." (Tr. 170). His "chronic pain" prevented him from getting a "good night's sleep" and "I wake up frequently through the night." (*Id.*). In activities of daily living, Harper noted difficulty "getting dressed [and] undressed sometimes." (*Id.*). His daughter had to "remind me to keep up with the time so I can take my meds at the right time." (Tr. 171).

Before the onset of his illnesses, Harper indicated that he could "work, walk around the mall or stores, yard work, swimming or ride my bike." (Tr. 170). He also used "to be able to prepare my own meals before he became disabled," but now "cannot stand

6

for long periods" and "have fallen asleep trying to cook in the past due to my medications." (Tr. 171). He did not "go out alone" any more and had "a lot of pain when trying to drive." (Tr. 172). "I do not go shopping my daughter shops for me." (*Id.*). Yet he retained the capacity to pay bills, count change, handle a savings account, and use a checkbook/money orders. (*Id.*).

As hobbies, he enjoyed gardening, motorcycling, and boating. (Tr. 173). But "I don't do these things anymore" because "I am unable to do any of these activities . . . since I have become disabled." (*Id.*). He spent time each day talking with others, and attended doctors' appointments once or twice a month. (*Id.*). He noted difficulty getting along with family, friends, and neighbors: "Sometimes I do get into arguments [with] people," and "I don't participate in social activities like I use[d] to." (Tr. 174). In the past, he was fired for getting "into a verbal altercation almost physical fight with a supervisor," and handled neither stress nor changes in routine well. (Tr. 175). Prompted to mark abilities with which he struggled, Harper marked: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, memory, completing tasks, concentration, using hands, and getting along with others. (Tr. 174). He could walk 300 feet before needing a 5-minute rest, and could pay attention for only 3 to 5 minutes. (*Id.*). He followed written and spoken instructions "fairly well." (*Id.*).

### ii.     Harper's Testimony at the Administrative Hearing

Opening his testimony, Harper discussed his schooling background, indicating that he does not read or write "very well" and that his daughter did "all" his reading for him. (Tr. 32). He was presently being treated for "[d]epression, my high blood pressure," and

7

an "enlarged" prostate. (Tr. 35). He treated previously for back pain as well. (*Id.*). Each day he would "[j]ust sit around the house" and "watch television" and "nap" for an hour or two. (Tr. 36). His medicines made him sleepy. (*Id.*). He performed no household chores; "[m]y daughter takes care of all of the household chores." (Tr. 37). And he had no source of income. (*Id.*). Though he suffered from substance abuse in his past, he "quit using drugs" about twenty years prior to the hearing, and stopped drinking alcohol two to three years before. (Tr. 38, 52).

Harper then faced questions about his "emotional state." (Tr. 38). "I done had a hard time. I just been depressed for awhile. I just – I don't know, just in general, just hadn't been able to focus on life for awhile for some reason." (*Id.*). He testified to hearing "voices sometimes" and frequently had a "hard time resting . . . ." (Tr. 39).

Harper next elaborated upon his physical issues. He could stand for about "five minutes without having to sit down and take a break," and could walk "about a block" to the corner store and back with comfort. (Tr. 40). He had "to constantly move around" due to the pain. (*Id.*). At times he used a cane. (Tr. 41). He required help taking care of personal hygiene and dressing. (*Id.*). Asked whether he could do a job "sorting parts at your own pace, for six and a half out of eight hours a day," Harper indicated that he "couldn't sit in a chair for that long without having to constantly move around, or lay down to adjust the pain, . . . So I could – you know, I can't just sit up in one spot for so long because I hurt so bad and I need to lay down for a few minutes and stretch out my muscles. And I could sit back up without being in agonizing pain all day." (Tr. 44). Nor did Harper think he could perform "any job that would require you to keep a production

8

standard, . . ." (Tr. 44-45). He avoided ladders and stairs. (Tr. 45). He no longer drove because his driver's license expired. (Tr. 46).

Harper's daughter, Shante Hopkins, was then sworn in. (Tr. 47). She indicated that Harper had lived with her for "[t]en years or more" and that he no longer drove. (Tr. 48). She went shopping for him and ensured he had breakfast and took his medication. (*Id.*). When Harper did not take his medication, Hopkins noted that he was "[v]ery mean, rude, kind of hard to control." (Tr. 49). He attended church with Hopkins every Sunday, but did not stay for any social gatherings afterward. (Tr. 52). She had her brothers check in on Harper each day to make sure "he hasn't hurt himself where if his back goes out, he can't move." (Tr. 53).

### iii. The VE's Testimony at the Administrative Hearing

The ALJ began with the first hypothetical: "I'd like you to assume for me if you would that he's 50 years of age with his education as it appears in the file, and the past work as it appears in the record. Assume further if you would that he has the limitations and impairments that he's alleged. And that his testimony is credible. Assuming those facts, in your opinion, would he be able to perform any sedentary or light work?" (Tr. 54). The VE said "No," and explained that "as a result of continuing medication side effects, he has to lie down daily between one to two hours," which would "preclude his prior work and any other work." (Tr. 54-55).

The ALJ then proposed a second hypothetical: "[H]e could perform light work with the following restrictions. He would require a sit stand option at will with no repetitive bending, twisting or turning. No repetitive pushing, pulling, gripping, grasping.

9

No air or vibrating tools. And it would need to be simple, repetitive work with simple verbal instructions. Occasional supervision and no constant close attention to detail. And lastly limited contact with the public. Assuming those facts, in your opinion, would there be jobs in existence in significant numbers in the regional economy that he could perform including any of his past work?" (Tr. 55). Although the VE did not think he could perform past work, "[t]here would be some light jobs. I'm looking at jobs in the unskilled classifications." (*Id.*). These jobs included: a reduced range of packer positions—with 4,500 regional job availabilities and 160,000 national job availabilities—a reduced range of inspector positions—with 3,000 regional job availabilities and 75,000 national job availabilities—a reduced range of bench assembler positions—with 2,000 regional job availabilities and 40,000 national job availabilities. (Tr. 55-56). Adding a record-keeping requirement would reduce these figures by fifty percent. (Tr. 56-57).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of

10

opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's

11

impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2,

12

1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR

13

96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

> (i) [D]aily activities;
> (ii) The location, duration, frequency, and intensity of . . . pain;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
> (v) Treatment, other than medication, . . . received for relief of . . . pain;
> (vi) Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

**G. Analysis**

In his appeal to this Court, Harper offers one objection to the ALJ's opinion—that the ALJ erred in failing to include the limitation that "Plaintiff needed closer than usual supervision due to his depressed mood and his need for careful orientation and training" in his second hypothetical question to the VE. (Doc. 24 at ID 339) (emphasis omitted). Because the hypothetical question, he avers, did not accurately portray his mental impairments, the VE's testimony could not serve as substantial evidence upon which the ALJ might ground his decision. (Doc. 24 at ID 340). The Commissioner suggests that Harper failed to properly develop this argument and thereby waived it. (Doc. 25 at ID 349). In the alternative, the Commissioner observes that an ALJ need incorporate only limitations he finds supported by the evidence in questions to the VE, and that conflicting evidence existed as to Harper's desired hypothetical limitation—that the ALJ resolved this conflict against Harper's interests did not undermine the result in this case. (Doc. 25 at ID 351-52).

Although Harper includes enough evidentiary discussion in his brief to avoid waiving his argument, he does not—and cannot—include enough to persuade this Court that he should prevail. As he astutely recounts, a VE's testimony may only serve as substantial evidence for the ALJ's Step Five burden if given in response to a question which "accurately portrays" a claimant's impairments. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). He derives his alleged limitation from Dr. Harley's medical opinion, which predicted that Harper was "[l]ikely to need closer than usual supervisory oversight due to depressed mood and need for direct, careful orientation to and training in assigned SRTs." (Tr. 70). He neither cites nor discusses any

15

other evidence tending to show that Harper was limited in this particular manner. The Commissioner, in response, points to conflicting evidence from Dr. Dickson, whose assessment suspected Harper of displaying "obfuscating behaviors throughout [his mental] exam," and opined that he was indeed "mentally capable of understanding, attending to, remembering, and carrying out instructions related to unskilled work related behaviors," with only "mild[]" impairments in "respond[ing] appropriately to co-workers and supervision and [adapting] to change and stress in the workplace . . . ." (Tr. 234). The ALJ afforded both Dr. Harley's and Dr. Dickson's opinions significant weight. (Tr. 22). But nonetheless, the ALJ also observed that Dr. Dickson performed "[t]he only psychological evaluation" in the record, and that no treating physician placed any restriction similar to the one theorized by Dr. Harley on Harper's functional capacity. (Tr. 21-22).

"When deciding . . . whether substantial evidence supports the ALJ's decision, we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 648 (6th Cir. 2011). The ALJ's discussion, alongside its supportive citations, illustrates exactly how he resolved this conflicting evidence in the record—as was his prerogative—and bolsters the strength of his conclusions. *Cf. Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 753 (6th Cir. 2011) ("While an ALJ is not required to discuss every piece of medical opinion evidence, the ALJ here did not nearly discuss enough of that evidence to enable us to determine whether substantial evidence supports the determination that Karger's impairments do not

16

render her disabled."). Where, as here, the ALJ's opinion properly weighs record evidence, this Court is not at liberty to second-guess any resulting benefits denial.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Harper's Motion for Summary Judgment, (Doc. 24), be **DENIED**, the Commissioner's Motion, (Doc. 25), be **GRANTED**, and this case be **AFFIRMED**.

### III. REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to

which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  June 26, 2017                                  S/ PATRICIA T. MORRIS
                                                      Patricia T. Morris
                                                      United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: June 26, 2017                                   By s/Kristen Castaneda
                                                      Case Manager